JA DAN, INC., a Florida Corporation and The United States f/u/b/o Ja–Dan, Inc., Plaintiffs,

v.

L–J, INC. and The American Insurance Company, Defendants/Third Party Plaintiffs,

v.

B & W CONSTRUCTION, an Alabama Partnership, Third-party Defendant.

No. 93–2135–CIV.

United States District Court, S.D. Florida, Miami Division.

Aug. 18, 1995.

H. Stephen Rash, Miami, FL, for plaintiffs.

Peter C. Jones, Welbaum, Zook & Jones, Coral Gables, FL, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

K. MICHAEL MOORE, District Judge.

This cause was tried before the Court non-jury. Having considered the testimony of witnesses, the documentary evidence and the stipulations of the parties, the Court enters its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## I. Findings of fact

1. On August 24, 1992, Hurricane Andrew struck south Florida, downing trees, scattering debris, and causing widespread destruction. The City of Miami Springs, Florida (the "City") was one of the communities in Hurricane Andrew's wake. To clean up the storm's damage, the City put a debris removal contract out for bid (the "Springs job").

2. Lawrence Holliday ("Holliday"), a representative of L–J, Inc. ("L–J"), a South Carolina corporation, traveled to south Florida after Hurricane Andrew had passed to get cleanup work for L–J.

3. Holliday initially decided not to bid on the Springs job. However, Earl Wheeler ("Wheeler"), a person who had worked with L–J in the past, convinced Holliday to submit a bid for him under L–J's name. Wheeler gave Holliday a price quote for the Springs job. Holliday took this quote, added profit for L–J, and obtained approval from David Jordan, L–J's president, to bid the total amount with the City.

4. Wheeler was to be the prime subcontractor for the Springs job if L–J was awarded the City contract. L–J then would finance the job. Under this arrangement, L–J would pay Wheeler's expenses and would debit the payments from Wheeler's price quote. When the City paid L–J at the end of the job, L–J would pay Wheeler his price quote, reduced by payments L–J made on his behalf. L–J would not pay for Wheeler's expenses in excess of his price quote.

5. This financing arrangement is common among contractors in cleanup projects. Like many contractors, Wheeler did not have the resources to do the job himself and did not have a sufficient payment/performance bond to obtain the City's contract on his own. Wheeler thus needed to work the Springs job through L–J.

6. On Thursday, October 1, 1992, Holliday told Wheeler that he wanted a list of the equipment Wheeler had lined up for the Springs job; that he wanted this list the next day; and that he wanted Wheeler's equipment to be on the site Sunday evening, ready to work the following morning.

7. L–J was the lowest bidder for the City's contract. Consequently, on Friday, October 2, 1992, the City entered into a bid award contract with L–J for removal of debris from public streets and rights of way.

8. Upon award of the contract, American Insurance Company ("American") issued a payment and performance bond guaranteeing L–J's obligations to the City and its workers.

9. At approximately the same time, L–J also obtained a contract to remove debris at Homestead Air Force Base. This was the biggest Hurricane Andrew project that L–J obtained. L–J subcontracted the Homestead job to Wheeler.

10. Contrary to Holliday's request, Wheeler did not contact Holliday on Friday, October 2, 1992 to identify his equipment for the Springs job. Instead, Wheeler was busy arranging his replacement at the Springs job and was still seeking equipment for the site.

11. On Saturday, October 3, 1992, Wheeler contracted with Charles McQueen ("McQueen") to take over the Springs job. In a one-page, handwritten contract, Wheeler and McQueen entered into an agreement for the Springs job "per same agreement that Earl Wheeler, L–J Incorporated, and Miami Springs had." McQueen agreed to pay $3000 to Wheeler "and his two partners" and $3500 to Ja Dan for one day's work. Wheeler signed the agreement as "Earl Wheeler L–J Incorporated." McQueen signed the contract on behalf of McQueen Contracting.

12. Wheeler had not met McQueen prior to the Springs job. McQueen was a friend of Holliday, and Holliday had asked McQueen if he wanted to work on the cleanup.

13. McQueen had no men or equipment to start the Springs job by Monday, October 5, 1992, which was the commencement date under L–J's City contract. Wheeler thus needed to find a crew to work that day.

14. On Sunday, October 4, 1992, Wheeler contacted Jeff Griffin ("Griffin"), a principal of Ja Dan, Inc. ("Ja Dan"), to obtain Ja Dan's assistance with the Springs job. Ja Dan possessed heavy equipment, a service truck, and a full crew.

15. Wheeler and Griffin drove out to the job site that evening. Wheeler called himself a supervisor for L–J, believing he was acting on L–J's behalf to secure equipment. He told Griffin that L–J would lose its contract with the City unless a crew was working Monday morning. Wheeler asked Griffin to show up Monday for at least one day's work, and he agreed to Ja Dan's hourly charges for its equipment. Wheeler told Griffin that L–J would pay Ja Dan directly for its work and remarked that he would soon be replaced by another L–J supervisor.

16. Griffin agreed to mobilize Ja Dan by Monday morning. Soon thereafter, Holliday contacted Wheeler over Wheeler's car phone. Wheeler informed Holliday that he had Griffin in the car and was getting equipment ready. Holliday told Wheeler to get Griffin to the job site by the morning.

17. The City debris removal job had been divided into two sections—the north and south sections. Ja Dan was assigned to the north section. By early Monday morning, Ja Dan had set up its equipment at the "staging area" for the north section and was in attendance at a preconstruction meeting. Holliday, Wheeler and City officials also were at the meeting.

18. Because the City was satisfied by Ja Dan's presence at the job site, L–J was not declared in default of the City contract. Holliday thus thanked Griffin at the end of the day for helping L–J keep the Springs deal. Although there is conflicting testimony, the greater weight of the evidence shows that Holliday also told Griffin that Ja Dan would be paid a full twelve hours for the day's work and asked Griffin to work the following day. Holliday remarked that Ja Dan might have to accept a reduction in the hourly rates it was charging for its equipment.

19. Ja Dan attended the preconstruction meeting on the next day, Tuesday, October 6, 1992. Holliday, Wheeler and McQueen also were present. After the meeting, Holliday informed Griffin that McQueen was replacing Wheeler and would set new hourly rates for Ja Dan's equipment. Holliday said he would assign Ja Dan to the City's north section and McQueen's crew to the south section. On or about this time, Wheeler left the Springs job

site to work at the Homestead Air Force Base.

20. Ja Dan continued work on October 7, 1992, still under the hourly rates agreed to by Wheeler. Near the middle of the day, Holliday told Griffin that Ja Dan's pay structure would be changed so that Ja Dan would be paid by the hour for some equipment and by cubic yardage of debris for other equipment. He told Griffin and McQueen to work out the details of this new arrangement.

21. McQueen and Griffin went to a nearby diner and entered into a one-page "renegotiated contract," which McQueen dictated and Griffin hand-wrote.[1] This contract specified hourly rates for certain of Ja Dan's equipment and established a rate of $1.349 per cubic yard of debris for other pieces of equipment. In the upper left corner of the document, Griffin wrote:

"McQueen. Sub

Ja–Dan, inc. Sublet"

At the bottom of the document, the contract stated that Ja Dan would load debris into trucks provided by McQueen "under direction of McQueen supervision as agent of L–J, Inc." McQueen signed the contract.

22. Ja Dan continued working in the north section under the new, second contract. Holliday discussed Ja Dan's renegotiated contract with McQueen, and he told Griffin that he could live with the contract's rates of pay. Holliday testified at trial, however, that he thought Ja Dan's cubic yardage rate was "exorbitant."

23. McQueen concentrated his work in the south section of the City. As a result, McQueen's crew and the Ja Dan crew worked separately.

24. After several days into the Springs job, L–J's vice president, Fred Snellings ("Snellings"), came from South Carolina with a written sub-contract for McQueen. While Snellings and Holliday were driving through the Springs job site, Snellings exited the car and walked over to McQueen. A discussion ensued, and Snellings returned to the car with a contract signed by "Danny McQueen." When Snellings informed Holliday he had

signed a contract with McQueen, Holliday replied that he should not have done that because L–J already had a contract with Wheeler. Holliday then tore up Snellings' contract. Holliday did not, however, immediately speak with McQueen about this matter or inquire whether McQueen had a copy of Snellings' contract.

25. During and after the Springs job, McQueen asked Holliday and Jordan whether he would get paid for his work on the project. Holliday and Jordan both promised McQueen he would be paid directly by L–J.

26. On October 16, 1992, L–J paid Ja Dan $34,934.95 for its first six days of work. Ja Dan, however, did not receive payment for the remaining twenty one days it worked. Both before and after the October 16, 1992 payment, Griffin asked Holliday for payment. Holliday responded on several occasions by promising that L–J would pay Ja Dan.

27. McQueen left the Springs job early and never finished the south section. L–J thus recalled Wheeler from the Homestead cleanup.

28. Upon his return, Wheeler resumed referring to himself as L–J's representative. On October 15, 1992, Wheeler wrote a letter to the City regarding the Springs job, which he signed as "Earl Wheeler LJ. Incorporated." Although there is conflicting testimony as to whether Holliday later told Wheeler not to sign on L–J's behalf again, it is undisputed that Wheeler wrote the City on November 2, 1992 and designated his letter as "From: LJ Incorporated." Holiday explicitly approved this letter.

29. On October 20, 1992, Wheeler negotiated a third contract with Ja Dan, which was to cover Ja Dan's work on its "second pass" over the north section of the Springs site. This contract eliminated Ja Dan's cubic yardage rate and set new hourly rates for all of Ja Dan's equipment. Above Wheeler's signature, the contract read: "Contract for: equipment rates for second pass debris cleanup for (Miami Springs) (LJ, Inc.)."

---

1. The contract is incorrectly dated "9–8–92."

30. Ja–Dan departed the Springs project on November 1, 1992 at the conclusion of its work.

31. The City paid L–J at the conclusion of the Springs cleanup.

32. L–J's officers testified that, or about November 5, 1992, Wheeler signed a subcontract with L–J on behalf of B & W Construction ("B & W") in which Wheeler memorialized his early-October agreement to subcontract the Springs job for $211,305.00. According to Jordan, it was not unusual for L–J to obtain written contracts from subcontractors after they had completed performance under oral contracts.

33. Wheeler, however, denied that he signed the November 5, 1992 subcontract. He testified that the agreement's signature page was taken from a subcontract he had signed with L–J years ago when he had worked in South Carolina in the aftermath of Hurricane Hugo.

34. L–J has adduced insufficient evidence to prove that Wheeler signed the subcontract with L–J on November 5, 1992. First, L–J never attempted to introduce the alleged November 5, 1992 subcontract into evidence. Second, because L–J's expenses on the Springs job were over $400,000, Wheeler stood to lose nearly $200,000 on the job. It thus was not in Wheeler's interest to sign the subcontract.

35. McQueen has testified that he never represented that he was an L–J employee or agent, never heard Wheeler call him an employee or supervisor for L–J, never considered himself a supervisor or foreman for L–J, never was on L–J's payroll, and never told Griffin he was running the Springs job for L–J. McQueen also testified that he subbed the entire job from L–J.

36. At trial, Ja Dan produced handwritten summaries and other documents purportedly reflecting the amount of work it performed on the Springs job. However, for the reasons stated below, the Court finds that these documents do not accurately identify the amount of work Ja Dan performed.

37. Although Ja Dan contended that it was at work from 7:00 a.m. to 7:00 p.m. almost every day of the project, the evidence reveals otherwise. Thomas Nash ("Nash"), a supervisor at the Springs site, testified that Ja Dan would start work between 8:30 a.m. and 10:30 a.m. and that Ja Dan's equipment was "down" on quite a few occasions. Charles Ramey ("Ramey"), a supervisor of inspectors for the City, confirmed the late starting times and the usual conclusion of work by 6:00 p.m. McQueen, too, testified that trucks frequently waited for Ja Dan to commence or continue work.

38. Stanley Byrd ("Byrd"), one of the partners of B & W Construction, was on the site to observe and record Ja Dan's work. His daily notes concerning the project, which Holliday analyzed (see below), show substantially fewer hours than Ja Dan's records for operation of all equipment, including trucks, on the project.

39. Byrd's testimony supports his recorded observations. Byrd testified that he carefully documented occasions when Ja Dan's equipment was inactive, that he determined that Ja Dan's equipment was inoperative for "a lot" of hours, and that he had complained to Griffin that his son would cause work to shut down when Griffin left the site.[2]

40. The Court credits Defendants' evidence of Ja Dan's work over Ja Dan's evidence for the following reasons:

a. Ja Dan consistently billed twelve hours per day, but numerous witnesses testified that Ja Dan frequently began work late, ended work earlier than reflected on its reports, and had numerous breakdowns and work stoppages during the course of the day.

b. Although Griffin testified that, on numerous occasions, his trucks would be loaded the night before for immediate transportation to the dump in the morning, and acknowledged a twenty minute transportation time to the dump, very few of Ja Dan's records reflect such deliveries. Griffin also testified that Ja Dan charged L–J for the

---

2. For example, Griffin's son would do dangerous stunts such as "wheelies" and "doughnuts" while Griffin was away.

fuel/service truck for only the first day of the project, but Ja Dan's time records and amounts claimed include charges for the fuel/service truck for a great majority of the days of the project.

c. Ja Dan's testimony reflected an estimate of 1.1 hours for each truck to load the debris, dispose of the debris, and return to the job site for another trip. Griffin agreed that this was a reasonable time. Holliday's testimony and evidence (which used a 1.5-hour time, also acknowledged by Griffin to be reasonable) reflected that Ja Dan's records overstated the number of hours Ja Dan's trucks worked. Given the twelve-hour day that was claimed by Ja Dan, each truck would be required to make at least eight trips per day. This simply did not occur according to Ja Dan's own records, which reflect an average of 3.3 loads a day.

d. Holliday analyzed Ja Dan's work on the project using the actual dump tickets from Metropolitan Dade County, Byrd's daily reports, and Ja Dan's own records. His testimony establishes that Ja Dan's equipment time charge (excluding trucks) was overstated by $39,998.75 and that the correct charge is $24,266.25.

e. Byrd's report shows the actual times worked by Ja Dan's trucks on a daily basis in significantly more detail than the handwritten notations of Ja Dan, which are at variance with its own backup material. Holliday's analysis also reflects an overcharge of $24,723.50 on Ja Dan's truck charge and indicates that the correct charge is $31,625.50.

f. Holliday's analysis indicates that Ja Dan loaded 29,694 cubic yards of debris under the McQueen contract. At a rate of $1.349 per cubic yard, Ja Dan is entitled to $40,057.21 for this work.

g. During idle time created by Ja Dan, L–J incurred charges by McQueen and others waiting on standby for Ja Dan's work crew to commence work. The time charged for these other forces amounted to $39,136.43 in "backcharges."

## II. Conclusions of law

1. The parties do not dispute that Ja Dan contracted to perform cleanup work on the Springs job. It entered into two written contracts covering this work—McQueen's "renegotiated contract" and Wheeler's October 20, 1992 contract. Ja Dan also entered into an oral contract with Wheeler when it agreed to show up for work on October 5, 1992. This oral contract, like the two written ones, is enforceable. "Express contracts may be either written or oral, or a combination of the two." *Ashcraft v. Dist. Bd. of Trustees of Valencia Community College,* 615 So.2d 271, 272 (Fla.Ct.App.1993).

2. What the parties dispute, however, is whether L–J was a party to these contracts. Wheeler and McQueen were the individuals who negotiated and signed the three agreements. Ja Dan claims that the two men were acting as Ja Dan's agents when they contracted with Ja Dan. L–J disagrees, contending that neither individual had the authority to enter into a contract with Ja Dan on L–J's behalf.

3. The Court finds that neither Wheeler nor McQueen had the actual authority to contract with Ja Dan on L–J's behalf. L–J initially bid the Springs job for Wheeler, and Wheeler was to be responsible for this cleanup. In addition, McQueen testified he believed he was a subcontractor rather than an employee of L–J. Ja Dan has produced little or no evidence indicating that, despite these facts, L–J gave Wheeler and McQueen explicit authority to commit L–J to contracts with other subcontractors (such as Ja Dan).

4. However, the evidence also shows that both Wheeler and McQueen had apparent authority to contract for L–J. "An agent's authority may be implied or apparent; it need not be conferred in express terms." *Sugarland Real Estate v. Beardsley,* 502 So.2d 44, 45 (Fla.Ct.App.1987).

> The power of an agent to bind his principal may rest on real or actual authority conferred in fact by the principal or may be founded on apparent or ostensible authority arising when the principal *allows* or causes *others to believe the agent possesses such authority,* as where the principal

knowingly permits the agent to assume such authority or where the principal by his actions or words holds the agent out as possessing it.

*Id.* at 46 (emphasis added, internal quotation omitted).

5. "The existence of an agency may be shown by any substantial evidence, either direct or circumstantial." *Id.* at 45 (internal quotation omitted); *Bradley v. Waldrop,* 611 So.2d 31, 32–33 (Fla.Ct.App.1992). "A [fact-finder] is entitled to infer from the facts and circumstances of the case the existence of an agency even where the alleged principal and agent both deny the existence thereof." *Sugarland,* 502 So.2d at 46. If an agent has apparent authority to enter into a contract on a principal's behalf, the contract is enforceable against the principal. *See, e.g., id.; Warren v. Department of Admin.,* 554 So.2d 568, 571 (Fla.Ct.App.1989).

6. Apparent authority does not arise from the subjective understanding of the person dealing with the purported agent, nor from the appearance created by the purported agent himself; instead, apparent authority exists only where the principal creates the appearance of an agency relationship. *Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A.,* 483 So.2d 775, 777 (Fla.Ct.App.1986). A principal can create the appearance of an agent's authority by "knowingly permit[ting] [an] agent to act in a certain manner as if he were authorized," *Rushing v. Garrett,* 375 So.2d 903, 906 (Fla.Ct.App.1979), by failing to correct a known misrepresentation by an agent that he or she has certain authority, *Owen Inds., Inc. v. Taylor,* 354 So.2d 1259, 1262 (Fla.Ct.App.1978), or by silently acting in a manner which creates a reasonable appearance of an agent's authority, *American Eagle Credit Corp. v. Select Holding, Inc.,* 865 F.Supp. 800, 813 (S.D.Fla.1994).

7. L–J's actions, in combination with those of Wheeler and McQueen, gave the reasonable appearance that Wheeler and McQueen had the authority to contract with Ja Dan on L–J's behalf. When Wheeler first negotiated with Griffin on October 4, 1992, he claimed to represent L–J, said L–J needed Ja Dan to work the next day, and stated that L–J would pay Ja Dan directly. Holliday's subsequent actions either caused or allowed Griffin to believe that Wheeler had, in fact, spoken correctly and had contracted for L–J. In Griffin's presence, Holliday directed Wheeler to make sure that Ja Dan was on the job site on Monday morning. At the end of the day on October 5, 1992, Holliday thanked Griffin for helping L–J keep its contract, asked Griffin to show up for work the next day, and indicated that Ja Dan would have to renegotiate its equipment rates. Finally, just as Wheeler had promised, L–J paid Ja Dan directly, rather than through Wheeler or B & W, on October 16, 1992; and, throughout the project, L–J promised Ja Dan that it would pay for Ja Dan's work.[3] These actions reasonably could have lead Griffin to believe that L–J was the party directing Ja Dan's work and, thus, was the party with whom he had contracted.

8. McQueen also held himself out as being authorized to contract on L–J's behalf when he signed Ja Dan's "renegotiated contract" as an "agent for L–J, Inc." Holliday's actions before and after this contract made it logical for Griffin to assume that the contract correctly stated McQueen's status and that L–J, through McQueen, was continuing to employ Ja Dan directly. Holliday had told Griffin on October 5, 1992 that Ja Dan would have to accept lower equipment rates. Further, on October 7, 1992, Holliday told Griffin that Ja Dan would have to accept a two-part rate structure and directed Griffin and McQueen to work out the terms of this arrangement. Finally, although Holliday later reviewed McQueen's "renegotiated contract," there is no evidence that Holliday sought to correct the contract's reference to McQueen as L–J's agent.

9. Wheeler again claimed to represent L–J when he signed the October 20, 1992 contract, which applied to equipment rates for "L–J, Inc." Given (1) that this was not the

---

**3.** Notably, although L–J maintains that McQueen was Wheeler's subcontractor, L–J nevertheless promised to pay McQueen directly for his company's work at the site. Given this, the Court finds it likely that L–J gave Ja Dan the same assurances, regardless of whether it believed that Ja Dan was a subcontractor of either Wheeler or McQueen.

first or last time that Wheeler signed on L–J's behalf, (2) that L–J had not corrected this problem or made clear to all parties that Wheeler was a subcontractor rather than its "supervisor," and (3) Ja Dan's course of dealing with Holliday, Wheeler and McQueen over the prior 16 days, the Court finds that L–J caused or allowed Wheeler to reasonably appear to have the authority to sign this third contract with Ja Dan.

10. The Court thus concludes that, from October 5, 1992 through October 31, 1992, Ja Dan worked on the Springs job under contracts with L–J. Since L–J's October 16, 1992 payment of $34,934.95 was only part payment for Ja Dan's work, Ja Dan is entitled to the remainder due under the three contracts. The Court thus finds in favor of Ja Dan under count I of Ja Dan's second amended complaint.

11. In determining Ja Dan's remaining balance, "[u]ncertainty as to the amount of damages or difficulty in proving the exact amount will not prevent recovery where it is clear that substantial damages were suffered and there is a reasonable basis in the evidence for the amount awarded." *Perma Builders, Inc. v. JBM Associates, Inc.*, 472 So.2d 1381, 1383 (Fla.Ct.App.1985) (internal quotation omitted).

12. As stated above, the Court accepts Holliday's analysis of Ja Dan's work at the Springs project. Ja Dan thus earned $39,998.75 in hourly equipment charges, $24,723.50 in hourly truck charges, and $40,057.21 for cubic yardage charges. These amounts total to $95,908.96. After deducting for L–J's October 16, 1992 payment of $34,934.95, Ja Dan has an outstanding balance of $60,974.96. Defendants seek to offset this amount by $39,136.43 in "backcharges." However, none of Ja Dan's contracts provide for deduction of "backcharges." The Court thus declines to deduct this amount.

13. Florida Statutes section 255.05(2) provides that, "[i]n any action brought to enforce a claim against a payment bond under this section, the prevailing party is entitled to recover a reasonable fee for the services of his attorney for trial and appeal or for arbitration, in an amount to be determined by the court, which fee must be taxed as part of his costs, as allowed in equitable actions."

The Court thus finds in favor of Ja Dan on count IV of the second amended complaint and concludes that Ja Dan shall recover reasonable costs and attorneys' fees for prosecuting this action.

14. American's bond applies to this dispute. Ja Dan is a claimant under its provisions. American is liable to Ja Dan up to the amount of the bond for damages and costs plus attorneys fees. The Court thus finds in favor of Ja Dan on count III of the second amended complaint.

15. Ja Dan is entitled to pre-judgment interest from November 1, 1992 through December 21, 1994 at Florida's 12% statutory rate and from January 1, 1995 at the statutory rate of 8% thereafter.

16. Having found the existence of a contract between L–J and Ja Dan, and having found that Ja Dan is entitled to recovery under that contract, the Court finds against Ja Dan on count V's claim for unjust enrichment and count VI's claim for quantum meruit.

17. Ja Dan shall submit a proposed final judgment to this Court awarding judgment to Ja Dan in the amounts set forth above. The proposed final judgment shall reserve this Court's jurisdiction to determine the costs and attorneys' fees that shall be awarded to Ja Dan.

**DONE AND ORDERED.**