[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 03-10272

———————————————

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**November 25, 2003**
**THOMAS  K. KAHN**
**CLERK**

D. C. Docket No. 01-00862-CV-J-21-HTS

WHETSTONE CANDY COMPANY, INC.,

Plaintiff-Appellant,

versus

KRAFT FOODS, INC., a
Delaware corporation,

Defendant-Appellee,

KRAFT FOODS UK, LTD.,
a wholly owned subsidiary of Kraft Foods, Inc.,

Defendants.

———————————————

Appeal from the United States District Court
for the Middle District of Florida

———————————————

**(November 25, 2003)**

Before DUBINA, WILSON and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

The main issue in this appeal is one of contract interpretation. We must decide whether a settlement agreement between Kraft Foods North America, Inc. ("Kraft NA") and Whetstone Candy Co. ("Whetstone") binds Kraft NA's subsidiary, Kraft Foods UK, Ltd. ("Kraft UK"). Kraft UK was not a party to the agreement and the express terms of the agreement do not reflect an intention to bind Kraft UK. We, therefore, uphold the express language that the parties agreed upon and conclude that the agreement does not bind Kraft UK. We deny Whetstone's appeal and affirm the district court's grant of summary judgment in favor of Kraft NA on that and all other issues.

I. Background

Whetstone, a Florida corporation with its principal place of business in Florida, manufactures, sells, and delivers confectionary products, including a "Chocolate Orange."

Defendant Kraft NA is a Delaware corporation with its principal place of business in Illinois.[1] Kraft NA manufactures, sells, and distributes food products, including confectionary products. Kraft NA wholly owns its subsidiary, Kraft Foods International, Inc. ("Kraft International"). Kraft International, in turn, owns 99.995%

_____

[1] Kraft NA was formerly known as Kraft Foods, Inc.

2

of Kraft Foods UK, Ltd. ("Kraft UK"), originally also a defendant in this action. Kraft UK is a business entity organized under the laws of the United Kingdom and has its principal place of business there. Kraft UK manufactures, sells, and distributes food products, including a chocolate-orange product called "Terry's Chocolate Orange."[2]

This case involves the legal construction of a settlement agreement between Kraft NA and Whetstone regarding the packaging of Whetstone's chocolate-orange product. The events leading up to the current litigation began in 1999. In June of that year, Kraft NA became aware that Whetstone was preparing to market a chocolate-orange product. Kraft NA asserted that Whetstone's packaging infringed upon Kraft NA's trade dress rights in Terry's Chocolate Orange.[3] Whetstone retained counsel who negotiated a Settlement Agreement with Kraft NA. In the Settlement

---

[2] Terry's Chocolate Orange is an orange flavored ball of chocolate that is the size and shape of a small orange. Since at least 1999, Kraft UK has sold Terry's Chocolate Orange to Kraft NA, which imports that product into the United States and sells it here.

[3] "Trade dress" is a term that refers to "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983). The term "is most frequently used to indicate the packaging or labeling of goods, but the design of the product itself may also constitute protectable trade dress. Trade dress is protected under section 43(a) of the Lanham Act, which prohibits any person from using a term, name, symbol or device, or any combination thereof, which is likely to confuse, mistake or deceive as to the manufacturer, origin or description of a good or service." Adolpho House Distrib. Corp. v. Travelers Prop. and Cas. Ins. Co., 165 F. Supp. 2d 1332, 1338 n.1 (S.D. Fla. 2001) (citations omitted); see 15 U.S.C. § 1125.

3

Agreement, Whetstone agreed to modify the packaging of its chocolate-orange product; in exchange, Kraft NA released Whetstone from any claims it may have against Whetstone regarding a possible trade dress violation.[4]

_____

[4] The operative terms of the Settlement Agreement are:

THIS AGREEMENT is by and between Kraft Foods, Inc. [now Kraft NA], . . .and the Whetstone Candy Company, Inc. . . .

WHEREAS, Kraft or one of its subsidiaries have been involved in the production and marketing of a "Chocolate Orange" confectionery product which is sold in a particular container (the "Kraft Trade Dress");

WHEREAS, Whetstone has developed a competing Chocolate Orange confectionery product (the "Whetstone Chocolate Orange Product") and a distinctive container for packaging of such product (the "Original Whetstone Container");

WHEREAS, Kraft has advised Whetstone of certain objections to the appearance of the Original Whetstone Container based upon an alleged violation of its rights in and to the Kraft Trade Dress;

WHEREAS, the parties wish to resolve their differences with respect to the appearance of the Original Whetstone Container and agree on a container design which Whetstone will use in the marketplace.

NOW THEREFORE, the Parties agree as follows: . . .

3. **Waiver**.  In consideration of the changes to the Original Whetstone Container listed in Paragraph 2 hereof, Kraft hereby fully and forever releases and discharges Whetstone, and its respective agents, attorneys, employees, affiliates, successors and assigns (the "Releasees"), of and from any and all responsibilities, duties, obligations, claims, debts, sums of money, accounts or causes of action or actions, costs, losses, damages or liabilities of whatsoever character, nature, kind or designation in law or in equity, absolute or contingent, matured or unmatured, suspected or unsuspected, known or unknown which Kraft or anyone claiming under, by or through it now has, ever had or could ever have or become entitled to assert against the Releasees by reason of any conduct, matter, course or thing whatsoever involving the original Whetstone Container, as modified according to Paragraph 2 hereof, and the Whetstone Chocolate Orange Product.

Subsequent to the signing of the Settlement Agreement in 2001, Whetstone attempted to market its chocolate-orange product in the United Kingdom through Hall Pride, Ltd. ("Hall Pride"), a London-based distributor. Upon learning of this plan, representatives from Kraft UK threatened legal action against Hall Pride if Hall Pride did not cease marketing Whetstone's product.[5] In addition, Whetstone alleges that, in the United States, Kraft NA representatives visited one of its customers, Phar-Mor drugstores, and warned that "they [Kraft NA] have a lawsuit against [Whetstone]" and

---

4. **Successors and Assigns**. The terms and provisions of this Agreement shall inure to the benefit of and bind the successors and assigns and legal representatives of both Kraft and Whetstone. . . .

7. **Choice of Law**. The parties acknowledge that the law of the State of Florida will govern all procedural and substantive questions relating to or arising out of this Agreement, including, but not limited to, all questions regarding the interpretation of any provisions of this Agreement.

8. **Integration**. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof, and supersedes all prior agreements understandings pertaining thereto. No covenant, representation or condition not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the express provisions hereof.

[5] Kraft NA admits that Kraft UK, through its legal advisor and corporate officer, notified Hall Pride in writing that Kraft UK considered the Whetstone chocolate-orange product to infringe upon Kraft UK's registered British and European trademark rights, and threatened legal action against Hall Pride if its marketing efforts continued. Whetstone has not made clear exactly how Kraft NA was involved in this activity, other than by alleging that Kraft NA and Kraft UK hold themselves out to the public as a single entity that uses almost identical letterhead. Whetstone also claims that they hold themselves out as a single entity by alleging that Kraft's Initial Public Offering document's clearly show that they are a single entity.

that Whetstone "might not be around to deliver the product." Phar-Mor, however, apparently disregarded the warning and purchased Whetstone's product.

Whetstone filed a three-count complaint based on the above events. In Count I, Whetstone sought a declaratory judgment as to its rights under the Settlement Agreement and judgment for damages in its favor against Kraft NA and Kraft UK. In Count II, Whetstone alleged that Kraft NA and Kraft UK knew about Whetstone's relationship with both Hall Pride and Phar-Mor, and that representatives from the Kraft corporations interfered with those business relationships by threatening unjustified legal action against Hall Pride and by telling Phar-Mor that the product was not legitimate. Whetstone sought damages for this alleged tortious interference. Finally, in Count III, Whetstone sought injunctive relief against Kraft NA and Kraft UK to prohibit them from interfering with the sale and distribution of Whetstone's chocolate-orange product.

After receiving the complaint, defendant Kraft UK filed a Motion to Dismiss and, among other arguments, asserted that it was not subject to in personam jurisdiction in the district court. The district court granted Kraft UK's motion and dismissed it from this action for lack of personal jurisdiction. Later in the proceedings, Whetstone filed a Motion for Partial Summary Judgment with respect to Count I. Defendant Kraft NA, at the same time, sought the entry of summary

6

judgment with respect to all counts. The district court concluded that there were no genuine issues of material fact and granted summary judgment in favor of Kraft NA on all issues. Whetstone appeals.[6]

II. Standard of Review

We review a district court's grant of summary judgment de novo. Pennington v. City of Huntsville, 261 F.3d 1262, 1265 (11th Cir. 2001). Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the facts and inferences in the light most favorable to the non-moving party. Pennington, 261 F.3d at 1265.

III. Does the Settlement Agreement Bind Kraft UK?

Generally, a contract does not bind one who is not a party to the contract, or who has not in some manner agreed to accept its terms. Consolidated Resources Healthcare Fund I, Ltd. v. Fenelus, 853 So. 2d 500, 503-04 (Fla. Dist. Ct. App. 2003); CH2M Hill Southeast, Inc. v. Pinellas County, 598 So. 2d 85, 89 (Fla. Dist. Ct. App. 1992). Here, it is undisputed that only Whetstone and Kraft NA signed the

---

[6] Whetstone's brief also argues that the district court improperly dismissed Kraft UK for lack of personal jurisdiction, but that ruling was not noticed in Whetstone's Notice of Appeal.

7

Settlement Agreement, but Whetstone advances several arguments positing that Kraft UK is bound by the Settlement Agreement. We consider these arguments in turn and reject each of them.[7]

A. The Plain Language of the Settlement Agreement

1. The "Whereas" Clause

Whetstone argues that the first "whereas" clause's reference to Kraft NA's subsidiaries operates to bind Kraft UK to the Settlement Agreement. That clause states: "WHEREAS, Kraft or one of its *subsidiaries* have been involved in the *production and marketing* of a 'Chocolate Orange' confectionery product which is sold in a particular container (the 'Kraft Trade Dress')." (Emphasis added). Whetstone argues that the purpose of the agreement was to redress the perceived invasion of rights possessed by "Kraft or one of its subsidiaries." They allege that the Settlement Agreement included the first "whereas" clause to make clear that Kraft NA entered into the agreement as the manufacturer of the product. Thus, Whetstone maintains that Kraft NA, as the parent corporation of Kraft UK, entered into the agreement on behalf of itself as well as all of its subsidiaries who were manufacturing

_____

[7] We note that the district court determined that the Settlement Agreement implicitly contains a geographic limitation that limits the effect of the agreement to the United States. Because of our holding with regard to Whetstone's plain language argument, we need not address whether the agreement implicitly contains a geographic limitation, and we express no view regarding that issue.

Terry's Chocolate Orange at the time it entered into the Settlement Agreement. Although some scenarios would allow Kraft NA to bind its subsidiaries, including Kraft UK,[8] such is not the case here.

First, the "whereas" clause is a true statement of the facts. Kraft UK is a subsidiary of Kraft NA and does produce and market Terry's Chocolate Orange. Consequently, the whereas clause accurately states Kraft NA's production system, but does not suggest that Kraft NA entered into the Settlement Agreement as a manufacturer. Rather, Kraft NA is an importer of Terry's Chocolate Orange and has a nonmanufacturing interest in protecting its own trade dress rights. See 15 U.S.C. § 1125(a).[9] Moreover, "whereas" clauses are not binding when the contract is

---

[8] As discussed below, under Florida law, if the facts allowed us to pierce Kraft NA's corporate veil to reach Kraft UK, or if an agency relationship existed between Kraft NA and Kraft UK, Kraft NA could bind Kraft UK to the terms of the agreement.

[9] Because Kraft NA did not enter the agreement as the manufacturer of Terry's Chocolate Orange, we must consider in what capacity Kraft NA did enter the agreement. The answer to that question is found in the Lanham Act, 15 U.S.C. § 1125(a). The act provides that "[a]ny person" guilty of a trade dress violation "shall be liable in a civil action by *any person* who believes that he or she is likely to be damaged by such [violation]." 15 U.S.C. § 1125(a) (emphasis added). The act does not limit the right to bring an action to those manufacturing a product. In this case, Kraft NA is an importer and marketer of Terry's Chocolate Orange and, as such, it does have trade dress rights in the product it imports. See Carillon Importers Ltd. v. Frank Pesce Group, Inc., 913 F. Supp. 1559, 1568 (S.D. Fla. 1996), aff'd 112 F.3d 1125 (11th Cir. 1997); Maher & Maher, Inc. v. Unisonic Products Corp., 719 F. Supp. 161, 164 (S.D.N.Y. 1989). Thus, it is likely that Kraft NA entered the Settlement Agreement as an importer and marketer of Terry's Chocolate Orange, and not as the manufacturer of that product. The third "whereas" clause strengthens this conclusion because, in stating the trade dress rights that are the subject of the Settlement Agreement, the clause refers specifically to the trade dress rights of Kraft NA, and not to any rights possessed by Kraft UK.

otherwise unambiguous.  Johnson v. Johnson, 725 So. 2d 1209, 1212-13 (Fla. Dist. Ct. App. 1999).  They are merely prefatory recitations of the facts that lead the parties to enter the agreement.  Id.

General principles of corporate law also dictate a conclusion that the "whereas" clause does not operate to bind Kraft UK.  Corporations are separate legal entities and contracts made by a parent corporation do not bind a subsidiary merely because one corporation owns all of the stock of the other corporation.  St. Petersburg Sheraton Corp. v. Stuart, 242 So. 2d 185, 190 (Fla. Dist. Ct. App. 1970); see Peacock v. General Motors Acceptance Corp., 432 So. 2d 142, 143 (Fla. Dist. Ct. App. 1983).  The agreement, according to its terms, was between Kraft NA and Whetstone.  Absent facts that would allow us to disregard Kraft UK's status as a separate entity, Kraft NA, acting as an importer alone, has no ability to bind Kraft UK, a separate entity, without Kraft UK's permission.  See Southeast Capital Inv. Corp. v. Albemarle Hotel, Inc., 550 So. 2d 49, 51 (Fla. Dist. Ct. App. 1989) (citing Dania Jai-Alai, Inc. v. Sykes, 450 So. 2d 1114 (Fla. 1984)); Peacock, 432 So. 2d at 144 (discussing the circumstances under which the corporate form can be disregarded for torts committed by a related entity).

2. "Under, By or Through" Kraft NA

10

Whetstone also argues that the plain language of paragraph 3 of the agreement, the "waiver" clause, binds Kraft UK. That paragraph, in relevant part, states that all claims against Whetstone dealing with the trade dress of its chocolate-orange product are waived by Kraft NA and "anyone claiming under, by or through it." Whetstone alleges that Kraft UK's claim is "under, by or through" Kraft NA and Kraft UK is therefore bound by the agreement. This argument has little merit for several reasons.

First, the Settlement Agreement explicitly uses the term "subsidiary" elsewhere in the agreement and, consequently, we should be reluctant to read this term into the "waiver" clause. Using the words "under, by or through" would be a cryptic method to bind the subsidiaries of Kraft NA, especially when the parties' referred to "subsidiaries" or "affiliates" in: (1) the reference in the first "whereas" clause to the fact that one of Kraft NA's subsidiaries produces Terry's Chocolate Orange; and (2) the first portion of paragraph 3, which discharges the "affiliates" of Whetstone from any infringement of the Kraft NA trade dress. The latter instance is particularly compelling because it appears in the same paragraph as the "under, by or through it" language that Whetstone argues binds Kraft UK. If the parties had intended to bind the affiliates or subsidiaries of Kraft NA, they would have included language similar to that used with respect to Whetstone.

Second, paragraph 4 shows how the phrase "under, by or through" should be interpreted and lends further support to the conclusion that "under, by or through" does not include Kraft UK. Paragraph 4 states that "[t]he terms and provisions of this Agreement shall inure to the benefit of and bind the successors and assigns and legal representatives of both Kraft and Whetstone." This paragraph identifies the entities, other than the parties, who are bound by the Settlement Agreement. As such, "under, by or through" operates as a release from claims made by the "successors and assigns and legal representatives" of Kraft NA–those who would claim "under, by or through" Kraft NA. The question, therefore, becomes whether Kraft UK is a successor, assign, or legal representative of Kraft NA. We hold that it is not.

A "successor" is "one that follows," especially "one who succeeds to a throne, title, or estate or is elected or appointed to an office, dignity, or other position vacated by another." Webster's Third New Int'l Dictionary 2282 (1976); accord Black's Law Dictionary 1431 (6th ed. 1990). An "assign," i.e. an assignee, is "one appointed to act for another" or "one to whom a right or property is legally transferred." Webster's Third New Int'l Dictionary 132 (1976); accord Black's Law Dictionary 118-19 (6th ed. 1990). Thus, successors and assigns are those entities or individuals who have a claim "under, by or through" Kraft NA by virtue of some act or event, such as an appointment or merger. Here, Kraft UK is a subsidiary of Kraft NA and, as a

12

subsidiary, it is merely related to Kraft NA through its corporate structure; it does not succeed Kraft NA and it has not been appointed to act for Kraft NA. Kraft UK, therefore, is not a successor or assign, and no credible argument can be made that it is Kraft NA's legal representative. Thus, any claims that Kraft UK has against Whetstone are not "under, by or through" Kraft NA.[10]

B. Whetstone's Arguments Based on Estoppel

Whetstone makes several arguments that Kraft NA and Kraft UK are estopped from denying that Kraft UK is bound by the Settlement Agreement. None of these arguments are compelling and we reject them.

1. Estoppel by Acceptance of the Benefits of the Contract

Whetstone argues that Kraft UK accepted the benefits of the Settlement Agreement and is, therefore, bound by its terms. "Where a party accepts the benefits of a settlement agreement or a compromise of his case and knows, or in the exercise of due diligence should have known, the facts concerning that settlement, the party ratifies the settlement by accepting the benefits whether the settlement was in the first instance authorized by him, and he is thereafter estopped from attacking the

_____

[10] The former Fifth Circuit interpreted a contract in a very similar manner in a case with facts analogous to those of this case. See Zim v. Western Publ'g Co., 573 F.2d 1318 (5th Cir. 1978). We acknowledge that Zim applied Wisconsin law, but note that the law in Wisconsin and Florida regarding corporate identities appears to be similar.

13

settlement." Sea-Land Serv., Inc. v. Sellan, 64 F. Supp. 2d 1255, 1262 (S.D. Fla. 1999) (holding that acceptance of a settlement check estops the party from challenging the settlement agreement even when the party did not sign the agreement).

Sea-Land Serv., Inc. is inapplicable to this case because Kraft UK accepted nothing. Kraft UK was not a party to the Settlement Agreement and Kraft NA entered into the agreement to enforce rights it independently held as an importer.

2. Equitable Estoppel

Whetstone further contends that Kraft UK is equitably estopped from denying that it is bound by the Settlement Agreement. Equitable estoppel "consists of words or conduct which causes another person to believe a certain state of things exists, and to consequently change his or her position in an adverse way." Southeast Grove Mgt., Inc. v. McKiness, 578 So. 2d 883, 886 (Fla. Dist. Ct. App. 1991); see Watson Clinic, LLP v. Verzosa, 816 So. 2d 832, 834 (Fla. Dist. Ct. App. 2002) (listing the elements of equitable estoppel).[11]

_____

[11] Whetstone argues that equitable estoppel applies to Kraft UK because Kraft UK's sole corporate officer was aware of Kraft NA's dispute with Whetstone and because Kraft UK was aware of the negotiations to settle that dispute. Whetstone states that Kraft UK was "fully informed" about the settlement negotiations, and contends that Kraft UK saw drafts of the agreement before and after its execution. Whetstone further contends that because Kraft UK did not voice any objection to the agreement until Whetstone attempted to sell its product in the United Kingdom that Kraft UK is estopped from claiming that the agreement does not bind Kraft UK. For summary judgment purposes, we assume that all of these facts are true.

14

As a matter of law, Whetstone's equitable estoppel argument fails because Whetstone cannot satisfy the first element. There is no evidence that either Kraft NA or Kraft UK made any representation to Whetstone that Kraft UK would be bound by the agreement. Equitable estoppel sometimes applies when there is, as here, merely silence or inaction, but the doctrine only applies in such circumstances "when the other party is misled to his or her injury." Southeast Grove Mgt, Inc., 578 So. 2d at 886. Here, however, there is no evidence that Kraft NA or Kraft UK misled Whetstone to Whetstone's injury.[12] Consequently, equitable estoppel is inapplicable to this case.

### C. Whetstone's Arguments Based on an Agency Relationship Between Kraft UK and Kraft NA

Whetstone also argues that because Kraft NA acted as the agent of Kraft UK during the settlement negotiations, Kraft UK is bound by the agreement. Alternatively, Whetstone contends that Kraft NA had apparent authority to bind Kraft

---

[12] Contrary to Whetstone's assertion that Kraft UK was "fully informed" regarding the settlement negotiations between Whetstone and Kraft NA, the record shows only that there was some communication between Kraft UK and Kraft NA. The record does not show what the substance of that communication may have been and, moreover, there is no evidence Kraft NA or Kraft UK ever misrepresented to Whetstone that Kraft UK would be bound by the agreement. Finally, the mere fact that Kraft UK received a copy of the agreement cannot reasonably be said to mislead a party into believing that the entity receiving a copy of the agreement is thereby bound.

UK. We hold that Kraft NA was not the agent of Kraft UK and that the doctrine of apparent authority is not applicable to this case.

### 1. Actual Authority

Whetstone's actual authority argument fails because there was no agency relationship in this case.[13] For actual authority to exist such that the principal is bound, there must be an agency relationship, which requires: (1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent. Meterlogic, Inc. v. Copier Solutions, Inc., 126 F. Supp. 2d 1346, 1354 (S.D. Fla. 2000).

There is no agency relationship here because there was no acknowledgment by Kraft NA that it would act for Kraft UK. Whetstone provides no evidence that the Kraft NA negotiators were actually employees of Kraft UK, nor does Whetstone claim that Kraft UK financed the business venture of Kraft NA, or offer any credible argument that Kraft UK authorized Kraft NA to act on its behalf. See id. at 1355 (evaluating these factors to determine whether there is acknowledgment). In addition, there is no question that the final element of an agency relationship–control–is

_____

[13] Whetstone claims that Kraft NA is Kraft UK's agent. The agency relationship, according to Whetstone, gave Kraft NA authority to settle the trade dress dispute on behalf of Kraft UK.

lacking here; Whetstone provides no evidence that Kraft UK controlled Kraft NA during the settlement negotiations.[14] As such, we fail to find any evidence that there is an agency relationship between Kraft NA and Kraft UK.

### 2. Apparent Authority

There was no reasonable basis for Whetstone to believe Kraft NA was the agent of Kraft UK and, consequently, apparent authority is not present in this case. Apparent authority exists when the principal creates the appearance of an agency relationship. Ja Dan, Inc. v. L-J Inc., 898 F. Supp. 894, 900 (S.D. Fla. 1995). The appearance of an agency relationship can be created when the principal knowingly permits the agent to act as if the agent is authorized, or "by silently acting in a manner which creates a reasonable appearance of an agent's authority," but cannot "arise from the subjective understanding of the person dealing with the purported agent." Id.

---

[14] The fact that there were communications between the two corporations during the negotiations does not establish control. There is no evidence that Kraft UK had any input into the negotiations or into the Settlement Agreement; the mere fact that Kraft NA sent Kraft UK a copy of the agreement does not establish control. See Meterlogic, Inc., 126 F. Supp. 2d at 1356-57 (noting that, in Florida, to find that a subsidiary corporation is the agent of the parent corporation, there must be a significant amount of control–so much control that the subsidiary has "no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation"). Such minor instances of what can be best characterized as the passing on of information between related corporations does not rise to the level of control required for an agency relationship.

17

Here, Whetstone argues that Kraft UK, by remaining silent and failing to object to the Settlement Agreement, acted in a manner that reasonably created the appearance of Kraft NA's authority to act for Kraft UK. Because Kraft UK had no input into the Settlement Agreement and because the agreement resolved only a dispute between Kraft NA and Whetstone, there was no reason to expect Kraft UK to object to the agreement. Thus, it was merely the subjective understanding of Whetstone that Kraft NA was the agent of Kraft UK and, as stated above, such an understanding does not create apparent authority.[15]

III. Whetstone's Tortious Interference Claims

A. Claims Involving Hall Pride

Whetstone claims that Kraft UK tortiously interfered with Whetstone's business relationship with Hall Pride, but asserts that Kraft NA is liable for this tortious interference because the Kraft corporations hold themselves out to the public as one large entity. As support for this allegation, Whetstone alleges (1) that the letter to Hall Pride–the allegedly tortiously interfering act–was sent on "Kraft Foods" letterhead, which, apart from bearing a London address, is the same as the letterhead

---

[15] Whetstone also argues that the doctrine of agency by estoppel applies. That doctrine, however, is so similar to apparent authority "that there is no significant difference between them." Carolina-Georgia Carpet and Textiles, Inc. v. Pelloni, 370 So. 2d 450, 451 (Fla. Dist. Ct. App. 1979). Consequently, we do not consider agency by estoppel separately and hold that it is inapplicable to the facts of this case.

used during the Settlement Agreement negotiations; and (2) that Kraft Foods Inc.'s Initial Public Offering ("IPO") documents state that Kraft NA owns Terry's Chocolate Orange, as well as other products manufactured by Kraft UK.[16]  In order to hold Kraft NA liable for any tortious interference committed by Kraft UK, we must find sufficient evidence such that a reasonable fact finder could pierce Kraft UK's corporate veil.  Peacock v. General Motors Acceptance Corp., 432 So. 2d 142, 143 (Fla. Dist. Ct. App. 1983).  There is insufficient evidence to do so in this case.

A review of Whetstone's evidence shows that there is no genuine issue as to whether the letterheads and IPO documents would allow a reasonable fact finder to determine that Kraft NA and Kraft UK are one large entity.  First, the letter sent to Hall Pride shares only one thing in common with the letters used during the settlement negotiations–both have the "Kraft" logo (i.e. the word "KRAFT" inside an oval) with the words "Kraft Foods" appearing to the right thereof.  Other than that, the letters are different.  Whereas the letter to Hall Pride bears a United Kingdom address immediately below the words "Kraft Foods," the letters from Kraft NA bear no address beneath those words where only the sender's name appears.  Although, the Kraft NA letters bear a U.S. address, followed by several U.S. telephone numbers at the bottom of each page, the Kraft UK letter bears the legend "Kraft Foods UK Ltd.,"

---

[16] Kraft Foods Inc. is the parent corporation of Kraft NA.

19

followed by the words "Registered and head Office" and the same United Kingdom address that appears at the top of the letter. Neither the letters from Kraft UK nor those from Kraft NA bear the names, logos, or addresses of the other corporation– only the Kraft UK name appears at the top and bottom of the Kraft UK letter, and only the Kraft NA name appears at the bottom of the Kraft NA letters. The similarities between the Kraft UK letter and the Kraft NA letters are greatly outweighed by their differences and are not enough to hold Kraft NA liable for any tortious interference that may have occurred. See USP Real Estate Inv. Trust v. Discount Auto Parts, Inc., 570 So. 2d 386, 390 (Fla. Dist. Ct. App. 1990) (noting that in order to pierce the corporate veil, "it must be shown not only that the wholly-owned subsidiary is a mere instrumentality of the parent corporation but also that the subsidiary was organized or used by the parent to mislead creditors or to perpetrate a fraud upon them"). The IPO documents add little to this analysis.[17]

B. Claims Involving Phar-Mor

---

[17] Contrary to Whetstone's assertion that the IPO documents show that Terry's Chocolate Orange is owned by Kraft NA, both the textual and pictorial references to products produced by Kraft UK are used to illustrate products produced by Kraft Foods Inc. and its subsidiaries, and to illustrate Kraft Foods Inc.'s international holdings. Such references are not, as a matter of law, enough to pierce Kraft UK's corporate veil to hold Kraft NA liable. See Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114, 1120-22 (Fla. 1984) (discussing characteristics of cases that have found sufficient evidence to pierce a corporation's veil, and stating characteristics that show a corporation has an identity separate from that of its parent).

Whetstone must show that it was injured to survive a motion for summary judgment based on a claim of tortious interference. G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1534 (11th Cir. 1985); ISS Cleaning Servs. Group, Inc. v. Cosby, 745 So. 2d 460, 462 (Fla. Dist. Ct. App. 1999). For summary judgment purposes, we assume that the remarks made to Phar-Mor are tortious and that they can be attributed to Kraft NA. In this case, however, it is undisputed that Phar-Mor purchased a large number of Whetstone's chocolate oranges after any tortious remarks were uttered. Consequently, Whetstone cannot show that it suffered damages as a result of any tortious interference that may have occurred and, therefore, Whetstone's claim fails. See Sobi v. Fairfield Resorts, Inc., 846 So. 2d 1204, 1207 (Fla. Dist. Ct. App. 2003) (noting that the elements of a tortious interference action require the plaintiff to prove damages).

IV. Personal Jurisdiction Over Kraft UK

In its brief, Whetstone argues that the district court erred when it dismissed Kraft UK from this action for lack of personal jurisdiction. We do not reach the merits of Whetstone's argument because we do not have jurisdiction to decide the issue. In its Notice of Appeal, Whetstone gave notice that it was appealing only the district court's summary judgment decision. It did not give notice of its intention to appeal the district court's earlier decision to dismiss Kraft UK for lack of personal

21

jurisdiction, and no notice of appeal was sent to any representative of Kraft UK. Where an "'appellant notices the appeal of a specified judgment only . . . this court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal.'" Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1375 (11th Cir. 1983) (quoting C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1056 (5th Cir. 1981)); see also Fed. R. App. P. 3(c)(B) (requiring that the notice of appeal "designate the judgment, order, or part thereof being appealed"); Cole v. Tuttle, 540 F.2d 206, 207 (5th Cir. 1976) (holding that there is no jurisdiction over a district court's interlocutory decision to dismiss several defendants when the plaintiffs never gave notice that they were appealing that decision).[18]

V. Conclusion

For the foregoing reasons, we affirm the district court's decision granting summary judgment to Kraft NA. We conclude that Kraft UK is not bound by the first "whereas" clause of the Settlement Agreement or by the "waiver" clause. In addition, none of the theories of agency or estoppel advanced by Whetstone operate to bind Kraft UK. We hold that Whetstone's tortious interference claims are inadequate as

---

[18] Cases decided by the former Fifth Circuit are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

a matter of law.  Finally, we dismiss, for lack of subject-matter jurisdiction, Whetstone's appeal regarding personal jurisdiction over Kraft UK.

AFFIRMED IN PART and DISMISSED IN PART.