The **UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK, f/k/a American General Life Insurance Company, Plaintiff,**

v.

**LOGUS MANUFACTURING CORP., and George S. Hack Irrevocable Trust (Virginia C. Hack, Trustee), Defendants.**

Case No. 10–81244–CIV–ZLOCH.

United States District Court,
S.D. Florida.

Jan. 31, 2012.

Gary John Guzzi, Akerman Senterfitt, Miami, FL, for Plaintiff.

Kenyetta Nicole Alexander, Mark R. Osherow, Katz Barron Squitero Faust, P.A., Ft. Lauderdale, FL, Stephen Charles Page, Preethi Sekharan, Page Mrachek Fitzgerald & Rose, Stuart, FL, for Defendants.

## ORDER

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon Plaintiff American General's Motion For Summary Judgment Regarding The George S. Hack Irrevocable Trusts's Counterclaims (DE 61), Defendant, Logus Manufacturing Corp.'s Motion For Summary Judgment (DE 32), and Defendant/ Counterclaimant / Cross Claimant / Cross Defendant George S. Hack Irrevocable Trust's Motion For Summary Judgment On Its Counterclaims For Breach Of Contract, Negligence, And Declaratory Judgment And Cross Claim For Declaratory Judgment And On Plaintiff's Complaint For Interpleader (DE 35). The Court has carefully reviewed said Motions, the entire court file and is otherwise fully advised in the premises.

This interpleader action was filed to determine the rightful owner to the proceeds of an American General Life Insurance Policy insuring the life of George Hack, the former President of Logus Manufacturing Corporation (hereinafter "Logus"), a closely-held family business that he co-owned equally with his brother, Thomas Hack. In 2001, George Hack attempted to change the Policy's beneficiary from Logus to the George S. Hack Irrevocable Trust (hereinafter "the Trust")—a personal trust of which his wife, Virginia, is the Trustee. Plaintiff American General Life Insurance Company (hereinafter "American General") received but did not record his requested change. In 2010, George Hack died unexpectedly and Virginia made claim to the proceeds. Thomas Hack, now President of Logus, asserts that the proceeds belong to the Corporation because his brother lacked authority to change the beneficiary and because his requested change was contractually insufficient.

To resolve this dispute, Plaintiff American General filed an interpleader action. See DE 1. By prior Order (DE 53), the Court ordered Plaintiff to deposit the proceeds of the Policy into a Court registry and required Defendants to interplead and resolve their claims to those proceeds. Each Defendant then filed a cross-claim against the other claiming to be the rightful owner and beneficiary of the Policy. Defendant Logus added a second cross-claim against the Trust for tortious interference with Logus's contract rights. In addition, Defendant Trust filed counterclaims against Plaintiff American General alleging that it breached the policy and committed negligence in failing to record George Hack's requested change. In light of these counterclaims, the Court required American General to remain as a party to this action.

Both Defendants have now filed cross-motions for summary judgment as to their cross-claims. DE Nos. 32 & 35. In addition, Defendant Trust and Plaintiff American General have filed cross-motions for summary judgment on the Trust's counterclaims. DE Nos. 35 & 61. For the reasons detailed below, the Court will declare Logus the rightful owner and beneficiary of the Policy, grant the Trust judgment as a matter of law on Logus's cross-claim for tortious interference with contract, and grant American General judgment as a matter of law on the Trust's counterclaims.

## I. Background

Logus Manufacturing Corporation was founded by George Hack, Sr., in 1962. In 1988, he handed the business off to his sons, George S., Thomas, and Steven.

George S. Hack (hereinafter "George Hack") became the President and Chief Executive Officer and allegedly carried out all details of Logus's daily business, including its financial affairs, with minimal oversight. DE 36, ¶ 13. Once a year, Logus's Board of Directors retroactively approved his actions. Virginia Hack served as Logus's Bookkeeper for over seventeen years, beginning in approximately 1992. *See* DE 36, ¶ 15. In that capacity, she assisted her husband with all administrative, financial, and clerical affairs. *Id.* Thomas Hack served as Secretary of Logus and allegedly had "little to no involvement" in Logus's daily management, operation, administrative, or financial affairs. *Id.* at ¶ 17.

In April 1997, Logus Manufacturing became 100 percent wholly owned by Logus Microwave Corporation (hereinafter interchangeably referred to as "Logus"). By 2001, Steven Hack had left the business and George and Thomas had each become 50 percent owners of Logus.

### A. The Life Insurance Policy

On March 5, 1992, George Hack, on behalf of Logus, applied for a life insurance policy naming himself as the proposed insured and Logus as the proposed owner and beneficiary.[1] George Hack signed as the insured and Thomas Hack signed as the owner on behalf of Logus. On April 24, 1992, American General issued the requested Policy to Logus. It listed "George S Hack" as the insured, and Logus as the owner and beneficiary. *See* DE 14–3, p. 8 ("The owner and beneficiary shall each be as designated in the application unless either is subsequently changed as provided in this policy.").

Under the Policy, only the owner was authorized to change the owner or beneficiary. It stated:

> While the insured is alive, the Owner or Beneficiary may be changed by the Owner. *Such change shall be made by written request to us at our Home Office.* If the change is not subject to the rights of any assignee of record or irrevocable Beneficiary, it will take effect when it is recorded by us. The change will then be deemed to be effective as of the date of the request for change, even though the insured may have died before the change was recorded. The change, however, will be subject to any payment that we have made or action we have taken before the request is recorded. If required by us, the policy must be sent to us for endorsement of the change.

DE 14–3, p. 15 (emphasis added).

According to Virginia Hack, in the fall of 2000, she and her husband met with their life insurance agent and estate planner, James Larschan. DE 40, ¶¶ 48–51. When they informed him of their financial needs, Larschan allegedly offered two pieces of advice. First, he advised them to create the George S. Hack Irrevocable Trust and fund the Trust with the instant Policy. *Id.* To accomplish this, Larschan allegedly referred the Hacks to attorney Randall C. Doane, who helped them create the Trust and attempt to change the Policy's beneficiary from Logus to the Trust. DE 37, ¶¶ 6 & 12. Specifically, in March of 2001, Doane aided George Hack in completing two forms from American General: (1) a "Request for Change of Ownership" form dated March 6, 2001 (hereinafter "the Ownership Form") (DE 32–1, p. 49); and (2) a "Beneficiary Designation" form dated March 5, 2001 (hereinafter "the Beneficia-

---

1. In the same year, Logus Manufacturing also purchased life insurance policies from American General insuring the lives of Thomas and Steven Hack.

ry Form") (DE 32–1, p. 51) (collectively "the Change Forms").[2] *See id.* at ¶ 12. Both George and Virginia Hack signed these forms in Doane's presence, and Doane then transmitted the forms to American General. DE 37, ¶ 13.

Second, Larschan allegedly advised George Hack to replace the instant Policy with a new life insurance policy from Northwestern Mutual worth two million dollars, and to purchase a matching policy on Thomas Hack's life. This, George Hack undisputedly did. George Hack's Northwestern Policy named him the insured and Thomas Hack the owner. The matching Policy named Thomas Hack the insured and George Hack the owner. According to the Trust, the goal of these Policies was to provide the surviving brother with enough money to buy the shares of the brother who died first.

### B. The Change of Ownership and Beneficiary Forms

The Ownership Form required the "Signature of Present Owner." Here, George Hack signed his name but did not include his corporate title. *See* DE 32–1. In the space calling for the "Owner's Tax I.D./ Soc. Sec. Number," George Hack provided his own social security number. On the lines for telephone number and address, he listed his home phone number and his home address. Beneath this, Virginia Hack filled out the "Signature of New Owner" section. On the "Name" line, she signed her name and listed her title of "Trustee." The Beneficiary Form required the name of the insured and the name of the owner. George Hack signed as both.

The reverse side of the Ownership Form contained instructions on how to complete it. DE 64, p. 7. Those instructions provided, in relevant part:

Instructions For Signing Request / How To Sign Present—Owners/ If signed by: (1) corporation, a copy of the corporate resolution authorizing the change and empowering a certain officer or officers of the corporation to act for it in changing this contract must accompany the request for change, signed by such officer or officers.

DE 32–1, p. 50.

Similarly, the reverse side of the Beneficiary Form contained instructions, which provided in relevant part:

Signature Requirements / 2. The current policy owner must sign this form. / 5. Corporate and Pension Trust Policyowners must show title and complete corporate name or pension plan name with each original signature.

DE 32–1, p. 52.

### C. American General's Response

It is undisputed that American General received Hack's completed Change Forms on March 12, 2001. However, the Parties dispute whether American General ever notified Logus that it considered these Change Forms to be insufficient. American General alleges that Corrine Horace, one of its representatives, called and spoke with Virginia Hack on April 5, 2001, and informed her that American General would need additional proof of George Hack's corporate authority. According to American General, Virginia Hack asked Horace to put these demands in writing. DE 64, p. 3. American General claims it did so right away. Horace allegedly faxed[3] Vir-

---

**2.** It is unclear from the record who had requested the Change Forms from American General—Hack, Doane, or Larschan.

**3.** American General has produced its copy of the allegedly faxed letter.

ginia Hack the letter she requested at the number she provided, and mailed a copy as well. *Id.* Virginia Hack does not recall speaking with any American General representative, and denies having ever received a fax. DE 40, ¶¶ 71, 76–78.

However, Defendant Logus has located in its files what it claims is the letter faxed by American General to Virginia Hack in 2001. *Id.* American General argues that the data printed on the letter demonstrates that Logus received the letter by fax in 2001. That data, printed along the top line of the first page, reads: "APR 05 '01 FR AGL of N.Y. 713 831 6926 TO 915618422196 P. 01/02." DE 42, ¶ 12.

While the Trust has not disputed that these were, in fact, the respective fax numbers of American General and Logus, it argues that this data does not prove the letter was ever faxed or received. DE 36, p. 17. It notes, for instance, that American General has not produced a facsimile confirmation sheet, as opposed to a facsimile cover sheet, to demonstrate it ever faxed the letter. It also points out that American General has not produced a certified return receipt proving the letter was mailed. *Id.* Moreover, it alleges that Virginia Hack never received or reviewed this letter, and it notes that there is no proof George Hack received or reviewed it either. *Id.*

In any event, American General did not "change its own records to reflect that any change of beneficiary or ownership had occurred." DE 97, ¶ 25. Logus continued to pay all of the Policy's premiums. The checks for these premiums were all signed by George Hack.

Nine years later, on July 8, 2010, George Hack suddenly died at the age of 52. Thomas Hack then took over as President of Logus. In a state court action that followed, Thomas Hack purchased his brother's 50 percent share in Logus, giving

him 100 percent ownership. Thomas Hack, Virginia Hack, and Logus also executed General Releases, releasing each other from any legal actions which they might otherwise be entitled to bring. The Trust was not a party to these Releases.

In late 2010, following the execution of these Releases, Virginia Hack, as Trustee of the Trust, attempted to claim the proceeds of the Policy. American General refused to pay and this action ensued.

## II. Standard

██ Because the Court's jurisdiction over this matter is premised upon diversity under 28 U.S.C. § 1332(a), the Court applies the substantive law of Florida, the forum state. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Florida law, the interpretation of provisions of an insurance policy is a question of law properly decided on summary judgment. *See James River Ins. Co. v. Ground Down Eng'g, Inc.,* 540 F.3d 1270, 1274 (11th Cir.2008); *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1381 (11th Cir.1993).

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment

> if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(a). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation omitted).

The moving party is entitled to "judgment as a matter of law" when the non-moving party fails to make a sufficient showing of an essential element of the case to which the non-moving party has the burden of proof. *Id.* at 322, 106 S.Ct. 2548; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). Further, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. Analysis

### A. The State Court Settlement

As a threshold matter, the Trust argues that the "General Release Of Ginny Hack, George Hack, The Trust And Estate" (DE 45–2, p. 32) (hereinafter "the Release") bars Logus from challenging the Trust's right to the proceeds at issue. DE 36, p. 20. Since the Release is a contract, this question is one of contractual interpretation.

■■■ "The cardinal rule of contract law is that a court should strive to effectuate the intent of the parties. When a contract term is clear and unambiguous, the best evidence of this intent is the term itself...." *Hibiscus Associates Ltd. v. Bd. of Trustees of Policemen and Firemen Retirement Sys. of the City of Detroit*, 50 F.3d 908, 919 (11th Cir.1995). "Contract interpretation is generally a question of law. Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent, such as precontract negotiations, to interpret the disputed term." *Lawyers Title Ins. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir.1995).

■■ After review of the Release, the Court makes the following two findings. First, the Release does not bar Logus from instituting and prosecuting its cross-claims for declaratory judgment and tortious interference against Defendant Trust because the Trust was not a party to the Release. To be clear, a different trust known as the George S. Hack *Revocable* Trust was a party to the Release, but Defendant George S. Hack *Irrevocable* Trust was not. In fact, Logus alleges it did not even know that the George S. Hack Irrevocable Trust existed until *after* the state court settlement, when it learned that this Trust had filed a claim for the Policy's proceeds.

■■ Second, the Release prohibits Logus from arguing that George Hack did not have corporate authority to change the Policy's beneficiary on its behalf. The Court reaches this conclusion based on the language of the Release, in which Logus clearly and unambiguously releases George Hack from any "claim" Logus may ever have against him "by reason of any matter, cause, happening, or thing, from the beginning of time." DE 45–2, p. 32. According to Black's Law Dictionary, the word "claim" means, among other things:

1. The aggregate of operative facts giving rise to a right enforceable by a court.

Black's Law Dictionary 281 (9th ed.2009). Logus's arguments squarely fit this definition of a claim because they assert an operative fact (George Hack's lack of authority) that gives rise to an enforceable right (Logus's right to the Policy's proceeds). What's more, Hack's attempt to change the Policy's beneficiary clearly qualifies as a "happening" or "thing." Thus, the contractual term "claim" is clear and unambiguous, and the Court finds as a matter of law that the parties to the state court settlement intended to bar Logus from challenging George Hack's authority as President to change the beneficiary of the instant Policy. In light of this finding,

the Court will not consider Logus's arguments on that topic.

As a practical matter, however, this prohibition means nothing for two reasons. First, George Hack's actual authority to change the beneficiary is not a material question in this action because even if he had such authority, that alone would not permit the Trust to recover. Instead, as the Court will explain below, the Trust must show that George Hack did not need Logus's consent to change the beneficiary, and that he strictly complied with the Policy's terms for doing so.

Second, Logus does not bear the burden of establishing its right to the Policy's proceeds. As the Court will explain below, even if the Policy was not a "key man" policy (and the Court today finds that it was), Logus's right to the proceeds vested upon the death of George Hack. Therefore, the Trust bears the burden of proving that Logus should be divested of its absolute right to those proceeds. Logus may thus prevail without challenging George Hack's actual authority.

### B. Right To Change The Beneficiary

Having disposed of that threshold matter, the Court observes that this case presents two dispositive questions. First, did the insured, George Hack, need the consent of the owner, Logus, to change the Policy's beneficiary? And second, if Hack did not need Logus's consent, did he strictly comply with the Policy's terms when he attempted to change the beneficiary from Logus to the Trust?

#### 1. Key Man Policy

■ As to the first question, the Court finds that George Hack needed Logus's consent to change the Policy's beneficiary because the Policy was a "key man" policy.

■ In Florida, "the right of an insured to change the beneficiary of a life insurance policy depends on the terms of

contract between the insurer as expressed in the life insurance policy. . . ." *Shuster v. New York Life Ins.*, 351 So.2d 62, 64 (Fla. Dist.Ct.App.1977). Where the right to change the beneficiary of a life insurance policy has been reserved, the named beneficiary "acquires no vested right or interest during the life of the insured, but acquires an expectancy." *Pendas v. Equitable Life Assur. Soc. of U.S.*, 129 Fla. 253, 176 So. 104, 110 (1937); *Ross v. Ross*, 20 So.3d 396, 398 (Fla.Dist.Ct.App.2009). That expectancy is defeasible during the insured's lifetime by transfer, assignment, or change of beneficiary. *Miller v. Gulf Life Ins.*, 152 Fla. 221, 12 So.2d 127, 130 (1942). Otherwise, that expectancy becomes vested upon the death of the insured. *See e.g., Bohannon v. Manhattan Life Ins. Co.*, 555 F.2d 1205, 1211 (5th Cir.1977). This principle applies even where the beneficiary is also the owner of the policy, unless the beneficiary's interest is irrevocable. *Ross, supra; see also*, 31A *Fla. Jur.2d* Insurance § 3335.

Here, Logus reserved the right to change the beneficiary, but there is no evidence that Logus's interest was irrevocable. Thus, the Court finds that Logus had an expectancy during the lifetime of the insured, George Hack. That expectancy interest then vested upon the death of George Hack, unless the Trust can show that George Hack's attempted change of beneficiary was effective when it was made in 2001.

The Trust attempts to do so by arguing that George Hack had authority as President of Logus to unilaterally change the Policy's beneficiary on Logus's behalf. In response, Logus argues that he had no such authority because the Policy was a "key man" policy. A "key man" policy is a life insurance policy purchased by a corporation on the life of a key officer or shareholder. Tinio, *Payment of premiums by*

corporation on corporate officer's life insurance policy as affecting right to policy, 56 A.L.R.3d 1086, § 3[a] (1974). It is standard practice, especially for a closely-held corporation, to purchase such a policy and to name itself the beneficiary. *Id.* A central purpose of a key man policy is that a closely-held corporation can use the proceeds of the policy to buy the insured's shares. *Id.* at § 2.

■■■ Key man policies differ from typical life insurance policies in one important respect: the consent of the corporation is typically required for any change in beneficiary, absent any arrangement to the contrary approved by the corporation's directors or trustees. *Gas–Ice Corp. v. Newbern,* 263 Or. 227, 501 P.2d 1288, 1292 (1972). The theory is that when a corporation takes out a key man policy on the life of an officer or shareholder, and continues to pay the policy premiums as they mature, the policy becomes a corporate asset and a constructive trust arises to protect the corporation's right to the policy's proceeds. *McMullen v. St. Lucie Cnty. Bank,* 128 Fla. 745, 175 So. 721, 722 (1937).

This was precisely the holding in *Wellhouse v. United Paper Co.,* 29 F.2d 886 (5th Cir.1929).[4] Brothers Alvin and Louis Wellhouse were the principal stockholders and officers in the United Paper Company—Louis, the president, and Alvin, the vice president and principal executive officer. Alvin, in his official capacity, purchased an insurance policy on his own life and named United Paper the beneficiary, after agreeing with Louis that the policy was intended to benefit the company. The policy granted Alvin the right to change the beneficiary. Thereafter, United Paper paid all the policy's premiums. Alvin later left the company after selling his stock to

Louis. He then attempted to change policy's beneficiary to his wife by sending a written request to his life insurance agent. It appears that the life insurance company did not record the requested change. When Alvin died, both his widow and United Paper claimed a right to the proceeds, and the life insurance company filed an interpleader action. The trial court found for United Paper.

On appeal, Alvin's widow argued, *inter alia,* that Alvin had the right to change the beneficiary under the policy's terms, and that he had done all he could to properly request that change. The Fifth Circuit Court of Appeals held that it need not reach the issue of whether Alvin utilized the proper method in attempting to change the beneficiary. Instead, the Fifth Circuit held that the dispositive issue was whether Alvin had the right to change the beneficiary of this key man policy without the consent of United Paper. In the Fifth Circuit's view, the answer was a definitive no:

> In obtaining the policy the insured acted, not for himself individually, but for the paper company, which paid for the insurance. The insurance having been acquired at the expense and for the benefit of the paper company, that company was the owner of the policy and the beneficiary of its provisions, including the one as to changing the beneficiary. Whatever rights or privileges the insured had under the terms of the policy, he held in trust for the party from whom the consideration proceeded. The policy as a whole was an asset of the paper company. Nothing in the evidence as to the circumstances attending the issue of the policy furnishes any

4. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

support for the contention that Alvin Wellhouse, before or after he ceased to have any connection with the paper company, had the right to change his beneficiary without the consent of the paper company. We conclude that he did not have that right....

*Id.* at 887.

Just as in *Wellhouse,* the dispositive issue in this case is whether George Hack needed the consent of the Logus corporation to change the Policy's beneficiary. The answer depends on whether the Policy was a key man policy. Logus argues it was, and advances two sources of support. *See* DE 62, ¶ 1. First, it points to the Application George Hack submitted to obtain the Policy, which contains a section entitled "Agent's Report" with a line labeled "Purpose." On that line, the words "key man" are handwritten. *See* DE 32–1, p. 4. Second, Thomas Hack has submitted an Affidavit swearing that the Policy was purchased as a key man policy, as were the American General Policies insuring his life and that of his brother, Steven Hack. *See* DE 34, ¶ 8. He also notes that when the Policy was purchased in 1992, George Hack was solely a corporate officer and did not hold any shares in Logus. At that point, George Hack, Sr. held 100 percent of Logus's shares.

For its part, the Trust has not denied the key man nature of the instant Policy, nor has it presented any argument or evidence to the contrary. *See* DE 79, ¶ 1 (remaining silent in response to Logus's allegation that the Policy was a key man policy). In fact, it essentially acknowledges that the Policy was a key man policy in its brief (DE 36). In addition, it is undisputed that Logus paid the Policy's premiums throughout the entire life of the Policy.

Since the Trust has not presented any genuine dispute of material fact on this question, the Court finds as a matter of law that the Policy was indeed a key man policy. Thus, the Policy was a corporate asset and Logus's consent was required to change the Policy's beneficiary. *See Wellhouse, supra; see also McMullen, supra.* Because George Hack did not demonstrate to American General that he had obtained such consent, the Court finds that Logus remains the Policy's rightful owner.

### 2. Strict Compliance

 Assuming *arguendo* that the Policy was not a key man policy, the question for the Court is whether George Hack strictly complied with the Policy's terms in attempting to change the beneficiary on March 5, 2001, and March 6, 2001.

 In Florida, one who seeks to change the beneficiary of a life insurance policy must strictly comply with the policy's terms. *Miller v. Gulf Life Ins.,* 152 Fla. 221, 12 So.2d 127 (1942). The doctrine of strict compliance exists to protect the insurance company, and only the insurance company may waive it. *Id.* at 130. Moreover, the doctrine of strict compliance differs vastly from the doctrine of substantial compliance employed by other states. Under the doctrine of substantial compliance, even where an attempted change of beneficiary fails to strictly comply with the policy's terms, a court of equity may still enforce the change. A party arguing for substantial compliance typically must prove that: "(1) the policy owner manifested a clear intent to the insurer of a desire to change the beneficiary and to designate the new beneficiary; and (2) the owner has taken substantial affirmative action to effectuate the change." 16 Lee Russ in conjunction with Thomas F. Segalla, *Couch on Insurance* § 60:31 (3d ed.2011). The principle underlying this doctrine is that equity regards as done that which ought to have been done. *Id.* at § 60:33. By con-

trast, strict compliance states reject the notion that equitable arguments can trump the express terms of the contract agreed to by the parties because to hold otherwise would be to rewrite the contract for the parties. *See id.*

In Florida, the burden of proving that there has been strict compliance, and therefore an effective change of beneficiary, rests squarely on the person claiming as the substitute beneficiary. *Follenfant v. Rogers,* 359 F.2d 30 (5th Cir.1966). While the exact definition of strict compliance must necessarily vary from one contract to another, Florida courts have held that a change of beneficiary is complete when the insured "has taken all steps necessary, and otherwise done all in his power, to effect a change of beneficiary, and all that remains to be done is some ministerial duty on the part of the [insurer]." *Sheppard v. Crowley,* 61 Fla. 735, 55 So. 841, 842 (1911).

A ministerial duty is one that requires no discretion on the part of the insurance company, such as a duty to endorse the policy. *Couch, supra,* at § 60:62. A non-ministerial duty, by contrast, requires the insurance company to exercise discretion as to whether it should record a change of beneficiary request. To be sure, insurance companies may not wield unbridled discretion over change of beneficiary requests. *See e.g., O'Brien v. McMahon,* 44 So.3d 1273, 1279 (Fla.Dist. Ct.App.2010). As the *O'Brien* Court held, such discretion

> must be read as creating some objectively reasonable standard. Otherwise, [it] would confer on [the insurance company] the unilateral right to decide which changes of beneficiary, if any, would be acceptable in [its] unfettered discretion, effectively giving [it] a veto over any change of beneficiary.

*Id.* Thus, the court held that "a beneficiary request [need only] contain enough information to allow [the insurance company] to act on the request." *Id.*

Applying these standards to the instant case, the Court must determine whether George Hack met the standard of strict compliance by answering two important questions regarding American General's discretion. First, did American General retain discretion to refuse to record a written change of beneficiary request from Logus's president, George Hack? Second, if so, did American General reasonably exercise that discretion?

The Trust would have the Court answer both questions in the negative. First, it argues that American General retained no discretion to refuse to record the requested change based on its doubts about George Hack's corporate authority. Second, it argues that if American General did retain such discretion, it exercised it unreasonably because Hack's intent was clearly evident in the Change Forms, and his corporate authority was clearly evident from his prior course of dealing with American General. *See e.g.,* DE 77, p. 4.

American General would have the Court answer both questions in the affirmative. First, it argues that it retained the discretion to refuse to record *any* change of beneficiary request that was not clearly being made by Logus. Without this discretion, American General notes, it may have exposed itself to legal liability for improvidently granting George Hack's requested change. Second, American General argues that its refusal to record George Hack's request was reasonable because he did not provide enough information in the Change Forms to clearly establish his authority to bind Logus.

The few courts to address these specific questions support American General's view that it retained discretion, and exercised it

reasonably. For instance, in *Moukalled v. Minnesota Mutual Life Ins. Co.*, 2002 WL 31008839 (E.D.Mich.2002), aff'd 88 Fed. Appx. 865 (6th Cir.2004), Great Lakes Color Printing, Inc. (hereinafter "Great Lakes") took out a key man insurance policy on its president, Jihad Moukalled, retaining itself as beneficiary. *Id.* at *1. The policy provided that the owner could change the beneficiary by filing a written request signed by the owner. *Id.* Thereafter, Moukalled killed his wife and children, and committed suicide. But before doing so, he left his sister with an envelope containing the policy. Affixed to the policy was a "post-it" note that read:

> Requested change of ownership to Jihad Moukalled, has been paying premium with personal checks. Requested change of beneficiary to wife and contingent beneficiary to sister Lina Moukalled. [/s/] Jihad Moukalled.

*Id.* His sister later filed suit against the insurance company to recover the policy's proceeds.

The district court entered summary judgment for the insurance company because it found, *inter alia*, that Moukalled signed his request for a change of beneficiary in his individual capacity, not his corporate capacity, and did not indicate in any way that he was acting on behalf of Great Lakes. It also found that Moukalled had failed to provide evidence that Great Lakes had authorized him to change the beneficiary. This latter fact was particularly important because Great Lakes had two other shareholders, and removing Great Lakes as the beneficiary "would potentially diminish company assets." *Id.* at *7. Significantly, the court reached this conclusion after applying a substantial compliance standard, a less exacting standard than strict compliance.

Also illustrative of these principles is *Johnson v. Primerica Life Insurance Company*, 34 F.Supp.2d 562 (W.D.Mich. 1998). In *Johnson*. Truman Dollar, the president and principal shareholder of a corporation called Resource Temporary Services (hereinafter "RTS"), obtained a life insurance policy insuring his life and naming RTS the owner and beneficiary. *Id.* at 564. Although the policy permitted only the owner to change beneficiaries, Dollar managed to successfully change the beneficiary to his wife. The corporation paid all the premiums throughout the life of the policy. After Dollar died, the insurance company paid the policy's proceeds to Dollar's wife. The corporation's receiver then brought a cause of action to recover those proceeds alleging that Dollar lacked corporate authority to change the policy's beneficiary. The district court granted summary judgment for the receiver because the insurance company had presented no evidence that Dollar had been authorized by the corporation to change the beneficiary. *Id.* at 566.

*Moukalled* and *Johnson* are squarely applicable here. As in those cases, the instant Policy provided that only the owner could change the beneficiary. Like *Moukalled*, George Hack signed only his name on the change of beneficiary request, and did not include his corporate title, nor any other evidence of his corporate authority. In fact, George Hack provided information that suggested he was acting in his individual capacity, such as his own social security number (instead of the requested owner tax identification number), his home telephone number, and his home address. And as in *Moukalled* and *Johnson,* George Hack did not provide any evidence that his corporation had agreed to the request. The Court concurs with the *Moukalled* court that an insurance company is justified in demanding such evidence, especially where other shareholders exist and the requested change would diminish corpo-

rate assets. Here, Thomas Hack was a 50% shareholder and had signed as the owner in the Application for the Policy. Thus, American General was on notice that George Hack was not the only officer of Logus and that the requested change would diminish Logus's assets.

Consequently, based upon the language of the instant Policy and upon the holdings of *Moukalled* and *Johnson*, the Court finds that American General retained the discretion to refuse to record George Hack's request, and reasonably exercised that discretion in doing so. Accordingly, George Hack did not strictly comply with the Policy's terms because he did not provide American General adequate proof that he possessed Logus's authority to change the Policy's beneficiary. His duty to do so was implied in the Policy and thus existed apart from the Change Forms' instructions. Hence, the Court need not decide the issue, raised by the Trust, of whether the instructions are a part of the Policy.

Next, the Trust argues that even if George Hack failed to strictly comply with the Policy's terms, it is still entitled to the Policy's proceeds. The Court now turns to consider the Trust's four arguments on that point.

## C. The Trust's Alternative Arguments

### 1. Substantial Compliance

First, the Trust argues George Hack substantially complied with the Policy's terms. However, the Trust can point to only one case in which a Florida court accepted substantial compliance in the context of a life insurance policy. *See Smith v. Wilson*, 440 So.2d 442 (Fla.Dist.Ct.App. 1983). Moreover, the continuing viability of *Smith* is doubtful because no other Florida court has followed its use of the substantial compliance standard. And to the extent it is still valid authority, the Court finds that it is distinguishable. In

contrast to the instant case, in *Smith* the insured undisputedly had the power to change the beneficiary without the consent of the named beneficiary. Thus, to the extent *Smith* applies at all, the Court finds it is inapposite.

### 2. *Waiver And Estoppel*

Second, the Trust argues that American General "waived its right to insist on strict compliance and is estopped from doing so" because it did not alert George Hack that his request was deficient. DE 36, p. 16. And even if it did attempt to alert him to this fact, the Trust protests, it should have followed up a second time once it heard nothing from him in response.

#### a. Waiver

"Under Florida law, waiver is the intentional relinquishment or abandonment of a known right or privilege, or conduct that warrants an inference of the relinquishment of a known right." *Mid–Continent Casualty Company v. Basdeo*, 742 F.Supp.2d 1293, 1330 (S.D.Fla.2010) (internal citations and quotations omitted). A finding of waiver requires proof of the following elements

> (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of that right; and (3) the intention to relinquish that right. Proof of these elements may be express, or implied from conduct or acts that lead a party to believe a right has been waived.

*Id.* (internal citations and quotations omitted).

Waiver by silence may occur when a party is under a duty to affirmatively vindicate its right and does not do so. *Richards v. Dodge*, 150 So.2d 477 (Fla. Dist.Ct.App.1963). However, delay alone

**1318**

does not constitute waiver. *See e.g., O'Brien v. O'Brien,* 424 So.2d 970 (Fla. Dist.Ct.App.1983).

Here, American General's alleged silence did not constitute a clear case of waiver. The Trust has cited no authority for the proposition that an insurance company's silence in response to a change of beneficiary request demonstrates the company's intent to waive its right to insist on strict compliance. For the Court to hold that American General waived that right by its alleged silence would be antithetical to the very purpose of strict compliance, which is to protect the insurance company from incurring liability in exactly this sort of situation. Thus, the Court rejects this argument.

#### b. Estoppel

■ Under Florida law, the party invoking estoppel must prove all facts and elements essential to that estoppel. *State v. Hadden,* 370 So.2d 849, 852 (Fla.Ct.App. 1979). Equitable estoppel requires proof of three elements

> (1) a representation by the party estopped to the party claiming the estoppel as to some material fact, which representation is contrary to the condition of affairs later asserted by the estopped party; (2) a reliance upon this representation by the party claiming the estoppel; and (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon.

*Travelers Indem. Co. v. Swanson,* 662 F.2d 1098, 1102 (5th Cir.1981) (citing Florida law).

■ Estoppel by silence or inaction may arise where the party to be estopped has a duty to speak or act and fails to do so. *See id.* (citing *Pasco County v. Tampa Development Corp.,* 364 So.2d 850, 853 (Fla.Dist.Ct.App.1978)). Where this si-

lence or inaction is "negligent" or "culpable," it may constitute a "representation." *See Travelers Ins. Co. v. Spencer,* 397 So.2d 358, 361 (Fla.Dist.Ct.App.1981); *Travelers Indem. Co.,* 662 F.2d at 1102. However, the party claiming estoppel by silence or inaction must still prove it was "misled to [its] injury" by detrimentally changing its position in reliance on that silence or inaction. *See e.g., Whetstone Candy Co., Inc. v. Kraft Foods, Inc.,* 351 F.3d 1067, 1076–77 (11th Cir.2003); *see also Southeast Grove Management Inc. v. McKiness,* 578 So.2d 883, 886 (Fla.Dist.Ct. App.1991). The party claiming estoppel must also prove that its reliance was "intended or reasonably anticipated" by the party to be estopped. *State v. Hadden,* 370 So.2d at 852.

■ Even assuming that American General did not notify George Hack of the deficiencies in his Change Forms, the Trust has not made out a *prima facie* case of estoppel. First, the Trust has not cited any authority establishing that a life insurance company has a duty to notify an insured or a substitute beneficiary that its change of beneficiary request is unacceptable. Nor has any Florida court so held. To the contrary, some courts have found that it is the duty of the *insured* to make certain that his life insurance company acts upon his change of beneficiary request. *See e.g., Kochanek v. Prudential Ins. Co. of America,* 262 Mass. 174, 159 N.E. 520 (1928) (holding that where an insured hears nothing from insurance company and takes no further action, insured abandons change of beneficiary request).

Estoppel has occasionally been applied against insurance companies that failed to complete a ministerial act. *See e.g., Crawford v. Wyant,* 284 Ill.App. 336, 1 N.E.2d 766 (1936); *Brown v. Home Life Ins. Co.,* 3 F.2d 661 (D.Okla.1925); *Goodrich v. Equitable Life Assur. Soc. of the U.S.,* 111

Neb. 616, 197 N.W. 380 (1924) (estopping insurance company from denying change of beneficiary where the agent of the company failed to transmit an otherwise proper change of beneficiary request to the company's home office). But as noted above, the act of recording Hack's request was not ministerial. Accordingly, the Court finds that American General was under no duty to notify George Hack or the Trust that the Change Forms were deficient.

Second, the Trust has not argued that it detrimentally changed position in reliance on American General's alleged silence. Instead, it simply posits that if American General would have notified George Hack of the deficiencies in the Change Forms, Hack would have remedied those deficiencies and thus secured the Policy's proceeds for the Trust. However, the Court rejects this argument because it is entirely speculative. *See e.g., Hunnicutt v. Southern Farm Bureau Life Ins. Co.,* 256 Ga. 611, 351 S.E.2d 638, 641 (1987) (rejecting similar estoppel argument by substitute beneficiary because "[s]peculation as to what a person, since deceased, *might* have done is insufficient.") (emphasis in original).

Third, the Trust's purported reliance was not reasonable because it could have simply contacted American General to confirm that the change of beneficiary had been made. When a party relies on another party's alleged misrepresentation, "that reliance must have been *reasonable* in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Cmty. Health Services, of Crawford Cnty., Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (emphasis added). Such reliance is not reasonable if the person induced to act had access to the truth:

If, at the time he acted, such party had knowledge of the truth, *or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means,* he cannot claim to have been misled by relying upon the representation or concealment.

*Id.* (emphasis added); *see also Mizell v. Deal,* 654 So.2d 659, 663 (Fla.Dist.Ct.App. 1995) ("estoppel by silence cannot exist where the parties have equal knowledge of the facts or the same means of ascertaining that knowledge."). The Trust's abject failure over a period of nine years to call or write to American General and request confirmation that it had been substituted as the beneficiary in the instant Policy renders its alleged reliance unreasonable.

### 3. *Gift*

█ Third, the Trust asserts that Logus gave the Policy to George Hack "and his designee, the Trust" as an incentive gift for Hack's 5 years of hard work at Logus. DE 36, p. 27. Logus argues that Hack actually gave himself this gift, and did not have authority from Logus to do so. The Trust retorts that Hack did not need Logus's permission because he had the inherent authority as president to make the gift. The issue for the Court is whether Hack had such inherent authority.

█ The Florida Supreme Court has held that if an insurance policy is given as a valid gift, then the policy terms regarding how to change the owner and beneficiary of that policy are irrelevant. *Miller v. Gulf Life Ins.,* 152 Fla. 221, 12 So.2d 127, 130 (1942). But the Florida Supreme Court has been equally clear that the legal right to gift a life insurance policy belongs to the owner of that policy:

In the absence of an express provision in such policy, creating vested rights in the

beneficiary, the right of the assured to pass title thereto by gift is a legal right flowing out of the *incidents of ownership;* to be exercised by him in the same manner that he may exercise that right in regard to any other chose in action."

*Id.* at 226–27, 12 So.2d 127 (emphasis added). In addition, a valid inter vivos gift requires "proof of actual or constructive delivery of the policy with intent to pass the title irrevocably." *Garner v. Bemis,* 81 Fla. 60, 87 So. 426, 427 (1921). The party asserting that such a gift occurred bears the burden of proving its occurrence by clear and convincing evidence. *Id.*

In the case *sub judice,* the Trust utterly fails to carry this burden because it has neither presented evidence that *Logus* intended to gift the Policy, nor that Logus was even aware that George Hack intended to gift the Policy. For instance, the Trust has produced no corporate resolution, no corporate minutes, and no affidavit of another corporate officer or director supporting its claim of gift. No doubt aware of this shortcoming, the Trust argues that the Change Forms themselves are evidence of Logus's intention to pass title of the Policy to the Trust. But these Forms only prove that *Hack* intended to gift the Policy, not *Logus.* Furthermore, the claim that Logus gifted the Policy is inconsistent with its continued payment of the Policy's premiums for nine years after the alleged gift. The Trust protests that these annual $1,500 payments were also incentive gifts, but this claim is likewise without any supporting evidence. Therefore, Hack has not adequately proven that Logus made an inter vivos gift of the Policy.

The Court also rejects the Trust's fourth and final argument that to award Logus the proceeds would be inequitable. This argument is not supported by law.

Accordingly, the Court will grant Logus judgment as a matter of law on its declaratory judgment claim for the Policy's proceeds. The Court will also grant American General judgment as a matter of law on the Trust's cross-claims for declaratory judgment and breach of contract.

### D. *Logus's Cross–Claim For Tortious Interference*

■ In its second cross-claim, Logus asserts that the Trust tortiously interfered with the life insurance contract at issue by filing a claim for the Policy's proceeds. In Florida, the elements of tortious interference with a contractual relationship are: "(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach." *Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.,* 125 F.Supp.2d 1093, 1103 (S.D.Fla.2000). Because the Court today awards Logus the Policy's proceeds, Logus has suffered no damages. Accordingly, the Court will grant the Trust judgment as a matter of law on this cross-claim.

### E. *The Trust's Counterclaim For Negligence*

■ In its second cross-claim, the Trust avers that American General owed it and George Hack a duty of reasonable care and diligence to effectuate George Hack's requested change of beneficiary, and its failure to do so constituted negligence. According to the Trust, this duty was either a contractual obligation, or was voluntarily undertaken by American General when it sent George Hack the blank Change Forms. Both arguments fail.

First, under the change of beneficiary provision, American General owed no duty to George Hack, because he did not have authority as the insured to change the

beneficiary. It certainly owed no duty to the Trust, because as a substitute beneficiary, it had no vested interest (or even an expectancy) in the Policy's proceeds. *See e.g., Morein v. N. Am. Co. For Life And Health Ins.,* 271 So.2d 308, 316 (La.Ct. App.1972) ("We are aware of no case where the insurer has been condemned to pay damages to a person who may have been named as beneficiary because the insurer or his agent failed to aggressively pursue the insured to see that the change of beneficiary was effected."). At most, American General owed a duty of care to the Policy's owner, Logus. And Logus has not complained that American General violated that duty.

Second, the record contains no evidence that American General undertook a duty to assist the Trust. In fact, when American General sent the blank Change Forms to George Hack (or his attorney), there is no evidence it even knew the Trust existed. On the contrary, as a substitute beneficiary, the Trust was always a "complete stranger" to the Policy, to whom American General owed no duty in tort. DE 64, p. 14.

While the Court does not hold today that a substitute beneficiary could never bring an action in tort based on the negligence of a life insurance company, the Court is convinced that on these facts, American General owed no such duty to the Trust. Therefore, the Court will grant American General judgment as a matter of law on the Trust's counterclaim for negligence.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. American General's Motion For Summary Judgment Regarding The George S. Hack Irrevocable Trusts's Counterclaims (DE 61) be and the same is hereby **GRANTED;**

2. Defendant, Logus Manufacturing Corp.'s Motion For Summary Judgment (DE 32) be and the same is hereby **GRANTED** in part and **DENIED** in part as follows:

 a. To the extent Defendant's instant Motion (DE 32) seeks summary judgment as to Count I of its cross-claim (DE 12), it be and the same is hereby **GRANTED;**

 b. To the extent Defendant's instant Motion (DE 32) seeks summary judgment as to Count II of its cross-claim (DE 12), it be and the same is hereby **DENIED;**

3. Defendant/ Counterclaimant / Cross Claimant / Cross Defendant George S. Hack Irrevocable Trust's Motion For Summary Judgment On Its Counterclaims For Breach Of Contract, Negligence, And Declaratory Judgment And Cross Claim For Declaratory Judgment And On Plaintiff's Complaint For Interpleader (DE 35) be and the same is hereby **DENIED;** and

4. Final judgment shall be entered by separate order.